826

## VITALE v. HUNTER, Warden, U. S. Penitentiary, Leavenworth, Kan.
### No. 1730 H.C.

United States District Court
D. Kansas.
Dec. 22, 1952.

———◇———

Marion Beatty, Topeka, Kan., Fred G. Mancuso, Kansas City, Mo. and Joseph M. Bonuso, Washington, D. C., for petitioner.

Eugene W. Davis, U. S. Atty., Ernest J. Rice, Asst. U. S. Atty. and Robert H. Bingham, Asst. U. S. Atty., all of Topeka, Kan., for respondent.

MELLOTT, Chief Judge.

Petitioner, before the court under a writ of habeas corpus, assails the validity of his detention by the warden of the United States Penitentiary at Leavenworth, Kansas. The response shows he is being held under two commitments issued by the District Court of the United States for the Eastern-District of Michigan, Eastern Division, on March 25, 1937, following pleas of guilty to illegal purchase and possession of narcotic drugs (Case No. 24014) and conspiracy to violate the Internal Revenue Laws (Liquor Taxing Act of 1934, 48 Stat. 313) (Case No. 24107). In the first-mentioned he was committed to the custody of the Attorney-General for imprisonment for a term of Ten (10) years "and to pay a committed fine * * * of $5000.00." In the other he was committed for a period of "Five years from and after expiration of term of imprisonment imposed in Case No. 24014." The sentences were aggregated for the purpose of computing good time allowances; and, after service of a portion

thereof, on June 9, 1939, he was released under a commutation of sentence signed by the President on May 26, 1939, to which further reference will be made.

The commutation, after reciting the details of the convictions to which reference has been made, stated:

"* * * (A)nd Whereas it has been made to appear to me that the said Salvatore Vitale is subject to deportation:

"Now, therefore, be it known, that I, Franklin D. Roosevelt, President of the United States of America, in consideration of the premises, divers other good and sufficient reasons me thereunto moving, do hereby commute the sentences of the said Salvatore Vitale to expire immediately upon his delivery by the Warden to agents of the Immigration Service duly authorized by the Secretary of Labor to receive him for the purpose of deportation, provided that should thereafter the said Salvatore Vitale be found within the United States, or any Territory or place subject to its jurisdiction otherwise than in the lawful custody of a federal officer, the commutation shall thereupon become null and void and of no effect, and he shall be returned to the penitentiary to complete the service of his sentences. * * *

(Signed) Franklin D. Roosevelt"

The record of court commitment made by the custodial officers, attached to the response, shows the aggregate 15-year sentence had been "inoperative 4623 days" from the date of petitioner's release under the commutation until his re-arrest at Los Angeles, California on February 1, 1952; that he will be eligible for parole November 19, 1954; that good time is allowable at the rate of 10 days per month; that he will be eligible for conditional release December 16, 1959; and that his full term expires November 19, 1964. Also attached to the response is a certified copy of an indictment returned by a Grand Jury in the Southern District of Florida, May 11, 1945, charging petitioner with an illegal entry into the United States on or about October 2, 1944, in violation of Title 8 U.S.C.A. § 180a. Warrant for his arrest under that indictment is in the hands of the United States Marshal for this District.

In the petition it is alleged—and partially supported by affidavits attached to a brief filed contemporaneously—that petitioner was arrested on January 31, 1952 at the International Airport in Los Angeles by the Immigration and Naturalization Service for being illegally in the United States because he did not have a visa to enter this country; that at the time of arrest he was enroute from Tijuana, Mexico to Rome, Italy by airplane, having previously purchased a ticket and booked passage to Rome; that he was traveling through the United States without a visa and was arrested while being transferred to a connecting line, which was awaiting his arrival and the arrival of other passengers from Tijuana, to be taken out of the United States; that by reason of an agreement between the Immigration authorities of the United States and Trans World Airlines, passengers of any nationality could travel between Europe and Mexico, or vice versa, passing through the United States without visas; that petitioner had been so advised by a travel agent in Tijuana, who "assured * * * [him] that he, as well as other aliens could travel safely through the United States in this manner;" that acting upon this advice, petitioner had "abandoned the reservation through the Venezuelan route (for which he had a ticket) and purchased a ticket from the said travel agent following the route going through the United States;" that his arrest at the Los Angeles airport was "without any right and in violation of his constitutional rights;" that if he had not been illegally arrested and detained "he would have continued upon his journey and would now be at his home in Italy;" and that his present incarceration in the Leavenworth Penitentiary, to which he "was committed, without a hearing, * * * to serve the remainder of his sentence which was approximately thirteen (13) years" is illegal.

Testifying briefly as a witness in his own behalf, petitioner produced two airline

tickets. Exhibit 1 is Passenger Ticket and Baggage Check No. 05800, Form 0264–20 of Pan American World Airways System. It appears to have been purchased in Rome, December 17, 1951, Flight Coupon No. 3 being attached, authorizing flight from Mexico City to Balboa and Flight Coupon No. 4 being attached, authorizing flight from Balboa to Caracas. On the basis of that evidence the court finds that petitioner, at the time of his arrest, had in his possession the unused portion of an airline ticket under which he could have traveled from Mexico City to Caracas. Exhibit 2 is Passenger Ticket and Baggage Check No. 35608, Form 0263–45 of CIA. Mexicana de Aviacion, S. A. (associated with Pan American Airways System). It appears to have been purchased at Tijuana, January 29, 1952, Flight Coupon No. 2 being attached, authorizing flight from Los Angeles to New York via TWA Flight No. 90, January 31, leaving at 12:30 p. m. This coupon indicates that coupon No. 1, which appears to have been used, had been for CIA. Flight No. 581, from Tijuana to Los Angeles, 10:10 a. m., January 31. Coupon No. 3, also attached, authorizes flight from New York to Rome via TWA Flight No. 944, February 1, 12:00 p. m. The court therefore finds that on January 31, 1952, petitioner was enroute from Tijuana, Mexico, to Rome, via Los Angeles and New York.

The agreement, referred to in the petition and in the affidavit of the travel agent, appears to have been signed by Trans World Airlines of Mexico, S. A. de C. V. and the Commissioner of Immigration and Naturalization on behalf of the United States of America, prior to January 15, 1952. Although proof of signing is meager, the court understands there is no substantial dispute that it was signed; so finding to that effect is made.

The preamble to the agreement recites it is: "In consideration of mutual benefits and advantages that ensue to the United States of America and to airlines, which carry alien passengers whose ultimate destination is to a place outside the United States and who pass in direct transit through the United States without stopover except for such time as may be necessary for refueling or servicing the plane or transferring to a connecting airline, be reason of removing the necessity for such alien passengers presenting a transit visa secured from an American consul abroad; * * *." Then follows the agreement, in several paragraphs—signatory airline being referred to as party of the first part—under which the airline agrees to accept for passage under the agreement.

"* * * only such aliens as have, before arrival in the United States, valid visas or other travel documents authorizing their entry into a country beyond the United States. * * * only such aliens as have, before arrival in the United States, valid passports permitting such alien passengers re-entry to the country issuing passport for a period not less than 60 days after date of transit in the United States: Provided, that all aliens, except * * * [exceptions not applicable here] must be returning residents or citizens thereof; * * *

"* * * only such alien passengers as may have confirmed connecting and onward reservations from the point of foreign embarkation to at least the next country beyond the United States."

Paragraph 3 of the agreement is as follows:

"The party of the first part agrees to accept the responsibility for strict supervision of these direct transit alien passengers at all stops in the United States and further agrees to execute and file a blanket bond on Form I-318 guaranteeing that such alien passengers will at all times while in the United States remain under the supervision of the party of the first part or its authorized agents and that such alien passengers will depart from the United States without undue delay under the terms of this agreement, the said blanket bond to provide for the forfeiture of $500 for each alien passenger failing to so depart. The party of the first part further agrees to assume the cost

of detention and transportation to his original port of embarkation to the United States of any such alien. Any transportation company carrying such alien within or through the United States will be considered as an authorized agent of the party of the first part."

Succeeding paragraphs require the airline

"* * * to assume the expense and procurement of adequate guard service and hotel accommodations or other detention facilities for * * * [such aliens] at * * * necessary stopovers in the United States;

"* * * to assume and pay overtime charges * * * required in connection with checking, by officers of the Immigration and Naturalization Service, of the departure from the United States of * * * [such] alien passengers;" and "to accept the responsibility and assume the expense of notifying the officer in charge of the Immigration and Naturalization Service at the port of departure sufficiently in advance so that an officer of such Service may be present to make the required check-out. * * * (T)o require a signed statement from each alien passenger carried under this agreement to the effect that such passenger understands that, in consideration of the fact that he is not in possession of a visa issued by an American Consul, he will not be considered as an applicant for admission to the United States and that he will not apply for such admission and that he will be under strict supervision during any stopover in the United States; *Provided,* that the party of the first part will not accept for passage any alien whom such party knows or has reason to believe would be inadmissible to the United States on other than documentary grounds were such alien an applicant for admission."

The several contentions of the petitioner may be gleaned from the summarization of his complaint. Upon brief he asserts the only question is: "Was he found in the United States on January 31, 1952 in violation of his commutation of sentence * * *?" The answer suggested by him is that the language of the commutation, considered "in its proper light," really means:

"If you ever come back to the United States with the intention of going at large and mixing with our population and if you are found here, you will have to serve the remainder of your sentence."

Respondent, on the other hand, urges petitioner was "found" as he awaited the arrival of the plane which was to take him on the next leg of his journey; that he had taken the calculated risk of being required to serve the remainder of his sentence when he landed in this country; that he had previously been "found" in the District of Florida but improvidently released upon bond, which had been forfeited; and that his re-incarceration in the penitentiary to serve the remainder of his sentences is valid.

Since the hearing the respondent has moved to re-open the proceeding for the purpose of showing, "by positive and direct proof," that petitioner was in Miami, Florida on the 2nd day of October, 1944, subsequent to the commutation when, it is charged in the indictment, he had made an illegal entry into the United States. This the respondent attempted to prove in the instant proceeding by calling petitioner as his witness; but he failed in that attempt, petitioner merely responding to most of the questions that his "answers might tend to incriminate him." In view of the conclusion reached by this court upon the issues actually tried, however, the motion to re-open is being denied.

The cases chiefly relied upon by petitioner[1] arose under the section of the Immigration Act dealing with "Deportation of undesirable aliens generally".[2] In the

---

1. Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 12, 92 L.Ed. 17; Di Pasquale v. Karnuth, 2 Cir., 158 F.2d 878.

2. Act of February 5, 1917, 39 Stat. 889, as amended 54 Stat. 671, Title 8 U.S. C.A. § 155(a).

Delgadillo case it was held an alien, who had shipped on an intercoastal voyage as a member of the crew of an American merchant ship, had not made an "entry" within the purview of the statute when his itinerary had been "forced on him by wholly fortuitous circumstances"—catapulted into the ocean when the ship was sunk, rescued and taken to Cuba. In the Di Pasquale case a similar holding was made where the alien, unknown to himself and while asleep, had been taken through Canada while enroute between Buffalo and Detroit. In the instant proceeding petitioner, knowing the ban which had been placed against his return, voluntarily and while awake, chose to pass through the United States and was "found" within this country. The cited cases are therefore inapplicable.

■ Nor is he on firmer ground in contending he was "in lawful custody of a federal officer" at the time he was arrested in Los Angeles. In this connection he adopts the false premise that he was in the custody of officers of the Immigration and Naturalization Service because of the agreement which had been signed with the airline. The agreement, it will be noted, specifies that any transportation company carrying the alien within or through the United States is to be considered as an authorized agent of the airline. The airline agreed it would "not accept for passage any alien whom * * * [it] knows or has any reason to believe would be inadmissible to the United States on other than documentary grounds were such alien an applicant for admission." Petitioner was within the proscribed group. He knew he was inadmissible to the United States and the penalty if he should be "found" therein. If he chose to accept the advice of a travel agent, who obviously had not studied the agreement the airline had made, it is the studied judgment of this court he must take the consequences.

■ One other matter should be considered. Petitioner contends he was committed, "without a hearing * * *. to serve the remainder of his sentence." Respondent, in his application to re-open, suggests he is in a position "to establish that no such hearing is necessary" and also to show "that the Pardon Attorney acted administratively" in causing petitioner to be re-incarcerated.

In Kavalin v. White,[3] decided by the Court of Appeals for this Circuit, it was held that the power to grant a pardon included the right to grant a conditional pardon and that the condition might be either precedent or subsequent. There, as here, there was nothing in the record to show that the pardon had not been revoked for proper cause, either in a judicial proceeding or by an executive proceeding in accordance with the terms of the pardon. The court declined to release in a habeas corpus proceeding. Cases decided under the statutes providing for the re-arrest and commitment of a prisoner released on parole or conditional release[4] are not entirely apposite; for such statutes require that the prisoner "be given an opportunity to appear before the Board [of Parole], a member thereof, or an examiner designated by the Board." But even under these statutes it has been held a court should not release under habeas corpus since "it would be ignoring the procedure established by the statute * * *."[5]

■ The court is of the opinion petitioner has failed to establish that he is illegally detained by the respondent warden. Order is accordingly being signed quashing the writ of habeas corpus and remanding him to custody.

3. 10 Cir., 1930, 44 F.2d 49.

4. Act of June 25, 1948, c. 645, 62 Stat. 853, 855, Title 18 U.S.C.A. §§ 4164, 4207, succeeding Title 18 U.S.C.A. §§ 716b, 719.

5. United States ex rel. Jacobs v. Barc, 6 Cir., 141 F.2d 480, 483. Cf. Christianson v. Zerbst, 10 Cir., 89 F.2d 40; Evans v. Hunter, 10 Cir., 162 F.2d 800; Hiatt v. Compagna, 5 Cir., 178 F.2d 42.